989 A.2d 864 (2010)
412 N.J. Super. 260
STATE of New Jersey, Plaintiff-Respondent,
v.
Henry KIM, Defendant-Appellant.
DOCKET NO. A-3863-08T4.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 2010.
Decided March 18, 2010.
*865 John Menzel, Point Pleasant, argued the cause for appellant.
Annmarie Cozzi, Assistant Prosecutor, argued the cause for respondent (John L. Molinelli, Bergen County Prosecutor, attorney; *866 Charles Cho, of counsel and on the brief).
Before Judges FISHER, SAPP-PETERSON and ESPINOSA.
The opinion of the court was delivered by
ESPINOSA, J.S.C. (temporarily assigned).
Defendant appeals from his conviction for refusal to submit breath samples, N.J.S.A. 39:4-50.2 and N.J.S.A. 39:4-50.4a, following his arrest for driving while intoxicated (DWI), N.J.S.A. 39:4-50. On appeal, he argues that the State cannot convict a defendant of refusing to submit breath samples if the proofs fail to establish beyond a reasonable doubt that he understood the standard statement read to him pursuant to N.J.S.A. 39:4-50.2(e) (the standard statement). We affirm.
On January 29, 2007, Officer Robert Pizzi of the Northvale Police Department was on patrol when he observed defendant's vehicle pull into the loading dock area of a company, Alliance Foods, at approximately 8:30 p.m. Defendant left his car and walked to a grassy area between Alliance Foods and the Bloomfield Diner. Officer Pizzi passed defendant's vehicle in his patrol car and saw defendant standing by a tree, facing the diner, his legs spread apart. Officer Pizzi pulled into the loading dock area and placed his vehicle behind defendant's car, which was running with the driver's door ajar. Officer Pizzi called out to defendant, who was walking away and appeared to be adjusting his pants. Defendant turned and began to walk unsteadily toward Officer Pizzi.
Officer Pizzi asked defendant why he was urinating in that area. Defendant looked down, "sort of chuckled," and stated that he was sorry. Officer Pizzi detected an odor of alcoholic beverage on defendant's breath and asked him if he had been drinking that evening. Defendant replied that he had been drinking at a friend's house in Norwood. Upon request, he produced his license, registration and insurance card.
Officer Pizzi asked defendant if he could run through some field sobriety tests and defendant agreed. The first test was the heel-to-toe test. Officer Pizzi asked defendant to stand heel-to-toe with his arms by his side while he demonstrated the test. Defendant was unable to maintain that position during Officer Pizzi's demonstration. Officer Pizzi asked defendant if he understood the instructions and he stated that he did. Defendant was unable to connect heel-to-toe on several occasions and, despite raising his arms for balance, stepped off the line.
Next, Officer Pizzi asked defendant to perform the one-leg-stand test, which he explained and demonstrated. He asked defendant if he understood the instructions and defendant replied that he did. As he performed the test, defendant once again used his arms to stabilize himself but was repeatedly unable to keep his foot raised as instructed. Officer Pizzi stated that "his foot was down more often than it was up."
Officer Pizzi testified regarding the third field sobriety test as follows:
A. I attempted to perform the nystagmus gaze test, otherwise known as the HGN,.... However, at that point, the language barrier was difficult, and I was unable to perform that test to completion.
Q. Please describe what you mean by the language barrier was now difficult?
A. I [ ] asked Mr. Kim to keep his head still and follow the tip of my stimulus *867 withwith his eyes only, and he was unable to do that.
Officer Pizzi arrested defendant for DWI, advised him of his Miranda[1] rights and placed him in the patrol car to take him to police headquarters.
A videotape was taken of the pertinent proceedings at police headquarters. Officer Pizzi read the Miranda warnings and the standard statement required by N.J.S.A. 39:4-50.2(e), including the supplemental instruction to be given when a defendant fails to consent to giving a breath sample. On each of the two occasions when defendant was asked if he would submit breath samples, he said, "No." All of defendant's interactions with Officer Pizzi were in English.
Before being released, defendant apologized for urinating in public and stated, "That's my fault."
Defendant was charged with driving while intoxicated, N.J.S.A. 39:4-50, refusal to submit to a breathalyzer exam, N.J.S.A. 39:4-50.2 and disorderly conduct, N.J.S.A. 2C:33-2(a)(1). Defense counsel submitted a letter dated February 26, 2007 to the court and prosecutor, noting his appearance as defendant's counsel. In that letter, counsel made a demand for a jury trial and represented that defendant would move to suppress "evidence (i.e., Defendant's person, breath, blood, etc.) [that] was seized unlawfully, without a warrant...." Counsel also stated that defendant would make other, unidentified, motions before trial pursuant to Rule 7:7-1.
An evidentiary hearing was conducted to determine whether Officer Pizzi had probable cause to arrest defendant for DWI. No motion was made to exclude evidence of defendant's refusal to give breath samples on the grounds that he did not knowingly refuse to submit such samples. Yet, despite the failure to make such a motion or to offer any evidence regarding defendant's proficiency in the English language, defense counsel raised the specter of defendant's lack of fluency through the officer's acknowledgement that he had some indication that defendant had difficulty with English. In denying the suppression motion, the municipal court addressed this "implication":
The defendant's implication that the defendant isn't totally conversant in English doesn't hold water to this [c]ourt because he cooperated, he understood, he answered questions as to whether he had been drinking. So, therefore, if he's not completely conversant in the English language, he certainly understands.
Prior to the trial on May 29, 2008, defendant made an additional motionto dismiss the charges on the grounds that defendant had been denied his right to a speedy trial. The motion was denied. Again, no motion was made based upon any alleged inability of defendant to understand English. In his opening statement, defense counsel addressed the refusal charge as follows:
Our contention is that this is not a refusal in the sense that Mr. Kim did have a sufficient understanding of the warnings read to him, that you'll see on the videotape, and that will probably be corroborated by-P-2 for his refusal to be considered a sufficiently knowing and voluntary [refusal] to warrant [ ] conviction.
At trial, Officer Pizzi testified to his observations. He acknowledged that defendant had difficulty with English and said at one point that he did not understand English. Officer Pizzi testified that defendant had a New Jersey driver's license. He did not know in what language *868 defendant had taken the written exam. Defendant did not testify or offer any evidence regarding his ability to understand English. In fact, no evidence was presented to identify defendant's native language.
The court reviewed the videotape of the proceedings at police headquarters, found defendant guilty of refusing to submit a breath sample, and acquitted him on the other charges. The court stated:[2]
With regard to the refusal, this was covered on the video tape. Mr. Kim refused the Breathalyzer. If there had been a Breathalyzer taken, those results might well have determined sobriety or lack of it. But there was no Breathalyzer. Defendant's refusal was made each time he was asked. The court finds that it was a knowing refusal. The defendant's ability to understand English and to respond in English to the questions put to him by the policeman as testified to credibly by the policeman as well as borne out on the video tape including the video tape section on the refusal itself, convinced the court beyond a reasonable doubt that Mr. Kim understood most of what the officer was saying to him throughout the encounter. It is clear to the court that the defendant understood he was being asked to give a breath test to determine if he was under the influence. He refused to do so. The video tape contained a reading of the required statements about the Breathalyzer and the obligation to take it. The court noticed the defendant clearly indicated by his responses on the video tape and his demeanor that he understood and was responding positively to what was being read to him. While the defendant indicated on the video tape that he did not understand some things at that point, the court was satisfied that with regard to that part of the case involving a refusal charge that the defendant knowingly refused and that was proven beyond a reasonable doubt by the officer's testimony, by the items placed into evidence, including the video tape.
Defendant was sentenced as follows: suspension of driving privileges for seven months; twelve hours at the Intoxicated Driver Resource Center; $300 fine; $100 Drunk Driving Enforcement Fund surcharge, and $33 in court costs. The sentence was stayed pending appeal.
Defendant appealed. In the trial de novo, the Law Division judge found him guilty of refusing to submit a breath sample, N.J.S.A. 39:4-50.2 and N.J.S.A. 39:4-50.4a, and imposed the same sentence as that imposed by the municipal court. The sentence was again stayed pending appeal.
On appeal, defendant argues the following:
POINT I
THE ISSUE PRESENTED IS ONE OF FUNDAMENTAL FAIRNESS: WHETHER THE STATE MUST CONVEY INFORMATION TO A BREATH TESTING SUBJECT IN A WAY THAT IS MEANINGFUL AND UNDERSTANDABLE TO THAT SUBJECT.
POINT II
MODERN NOTIONS OF DUE PROCESS AND FAIR PLAY DICTATE THAT A NON-ENGLISH-SPEAKING ARRESTEE SHOULD BE INFORMED OF RIGHTS IN HIS NATIVE LANGUAGE BEFORE A COURT CAN CONSIDER HIS FAILURE TO SUBMIT BREATH SAMPLES *869 AS PROOF OF REFUSAL BEYOND A REASONABLE DOUBT.
POINT III
EVIDENCE THAT DEFENDANT DID NOT UNDERSTAND THE STANDARD STATEMENT REQUIRED TO BE READ TO HIM WAS PALPABLE, RAISING DOUBT ABOUT THE SUFFICIENCY OF THE EVIDENCE NEEDED TO CONVICT HIM.
The thrust of defendant's appeal is that the State cannot convict a defendant of refusing to submit breath samples if the proofs fail to establish beyond a reasonable doubt that he understood the standard statement. We reject these arguments because the issue was not adequately presented at trial and, in any event, lacks merit.
Proof of such understanding beyond a reasonable doubt is not required for a refusal conviction. State v. Marquez, 408 N.J.Super. 273, 280-281, 974 A.2d 1092 (App.Div.), certif. granted, 200 N.J. 476, 983 A.2d 201 (2009). In Marquez, this court upheld the conviction of a defendant who did not understand English for refusing to submit to a breath test, N.J.S.A. 39:4-50.2, "because the law does not require a translation of the standard statement under N.J.S.A. 39:4-50.2(e) and because defendant gave his implied consent to submit to a breath test when he obtained his New Jersey driver's license." Marquez, supra, 408 N.J.Super. at 275, 974 A.2d 1092; see N.J.S.A. 39:4-50.2(a).
In State v. Cummings, 184 N.J. 84, 875 A.2d 906 (2005), the Supreme Court held that the State must prove all elements of a refusal beyond a reasonable doubt but adhered to the elements of refusal set forth in the statute:
Police officers still must provide defendants the standardized statement of the consequences for the failure to submit to a breathalyzer test ...; the police officer must still have had "probable cause to believe that the person had been driving ... under the influence of intoxicating liquor ...; the police officer must still demonstrate whether the defendant was placed under arrest; and the police officer must still prove that the defendant `refused to submit to the [breathalyzer] test upon request of the officer.' Save for the burden of proof, nothing has changed.

[Id. at 96, 875 A.2d 906 (emphasis added) (citations omitted).]
"[A]nything substantially short of an unconditional, unequivocal assent to an officer's request that the arrested motorist take the breathalyzer test constitutes a refusal to do so." State v. Widmaier, 157 N.J. 475, 497, 724 A.2d 241 (1999) (quoting State v. Bernhardt, 245 N.J.Super. 210, 219, 584 A.2d 854 (App.Div.), certif. denied, 126 N.J. 323, 598 A.2d 883 (1991)). The evidence presented at defendant's trial, including his two refusals to submit breath samples, satisfied each of the elements identified by the Supreme Court in Cummings beyond a reasonable doubt.
There is also a procedural bar to defendant's argument. Defendants who seek to exclude evidence on constitutional grounds are required to file a motion to suppress the evidence in accordance with Rule 3:5-7, governing motions to suppress in the Law Division, and Rule 7:5-2, for motions to suppress filed in the municipal court. In State v. Howard, 383 N.J.Super. 538, 550, 892 A.2d 751 (App.Div.) certif. denied, 187 N.J. 80, 899 A.2d 303 (2006) we held that a defendant who "seeks to bar admission of breathalyzer test results because of a police officer's failure to comply with the statute ... is obligated to move to suppress the breathalyzer test results and present evidence of the police officer's non-compliance." *870 Ibid. In addition to filing a motion, a defendant must show that there are material facts in dispute to be entitled to an evidentiary hearing. R. 3:5-7(c); State v. Green, 346 N.J.Super. 87, 90-91, 787 A.2d 186 (App.Div.2001); State v. Kadonsky, 288 N.J.Super. 41, 45-46, 671 A.2d 1064 (App.Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996); State v. Hewins, 166 N.J.Super. 210, 213-15, 399 A.2d 343 (Law Div.1979), aff'd, 178 N.J.Super. 360, 429 A.2d 367 (App.Div.1981). We conclude that the same obligations apply to this defendant.
Here, defendant failed to move to exclude the evidence of his refusal. In Marquez, it was undisputed that the defendant did not understand the standard statement read to him in English. The defendant testified to that effect and also stated that he had taken the written examination for his driver's license in Spanish. Marquez, supra, 408 N.J.Super. at 277, 974 A.2d 1092. Unlike Marquez, defendant here presented no evidence regarding his level of proficiency in the English language. He never testified that he did not understand the statement read to him in English. No evidence was presented regarding how long he has resided in the United States, his education or employment, whether he holds any professional licenses or even in what language he had taken the written examination for the New Jersey driver's license. The mere allegation that defendant did not have sufficient comprehension of the English language to knowingly refuse to submit breath samples does not place a material issue in dispute to require an evidentiary hearing, see Green, supra, 346 N.J.Super. at 91, 787 A.2d 186, let alone void the basis for his conviction.
The practical necessity for defendant to bear the burden of moving forward and presenting sufficient evidence to create a material issue of fact is evident from a review of the evidence of such alleged incapacity here. Essentially, the evidence consists of: defendant's self-serving statements to the police officer that he did not understand; the officer's subjective perception of defendant's language ability; and the videotape.
A review of the videotape is far from conclusive. At the outset, defendant adjusts his clothing and combs his fingers through his hair as he looks directly into the camera, apparently aware that he is about to be filmed. The officer states, "I'm going to advise you of your constitutional rights, sir, okay?" Defendant responds without hesitation, "Yes, sir. Alright." The officer then instructs defendant that he must answer yes or no after each right is given. Again, defendant responds without hesitation, "Okay." As soon as the officer begins to provide the first of the Miranda warnings, "You have the constitutional right to remain silent, okay?" defendant raises a hand as if to stop the officer. Although some of his response at this time cannot be understood, due either to his accent or to the quality of the audio recording, he does say, "I don't understand anything right now," and "I have to speak to my lawyer." The officer replied that he just had to "read these rights and you have to sit there, okay?" Defendant answered, "Yes," and did so. He stated "no" after being advised that anything he said could be used against him in a court of law and that he had the right to have an attorney present during any questioning. He was silent when advised of the right to have an attorney appointed for him. When told that he had the continuing right to exercise these rights at any time during questioning, he appears to mumble that he understood that.
The officer then began to review the facts of the arrest, stating that he had *871 arrested defendant for driving while under the influence of intoxicating liquor or drugs. Defendant interrupted him, stating, "That's what I don't understand. What's intoxicating?" When the officer completed reading the standard form, he asked defendant, "Will you submit samples of your breath?" Without hesitation or expressing any difficulty in understanding the question, defendant shook his head. The officer stated, "I need you to speak clearly, yes or no." Defendant responded immediately, "No, sir. No."
The officer read the supplemental form to be read when a defendant refuses to give breath samples and stated, "I ask you again. Will you submit samples of your breath?" Defendant answered, "I don't understand that. I don't want to say anything. I say `no.'"
This videotape was made at a time when the officer had probable cause to arrest defendant for DWI. It is evident that defendant speaks English with an accent. However, that alone is a poor and perhaps even misleading measure of his ability to understand what is said to him in English. It also appears that defendant is familiar with the concept of his "constitutional rights." While his responses to each of the Miranda rights given are somewhat ambiguous, he demonstrates his familiarity with the rights to an attorney and to decline to make a statement. His responses to the specific requests to give breath samples were unequivocal. Without any evidence regarding defendant's education, employment, amount of time in an English-speaking country or any other objective facts, a factfinder can do no more than guess whether any perceived difficulty in comprehension was caused by intoxication, lack of fluency in English, or some combination of factors.
In short, defendant did not move for the exclusion of the evidence of his refusal and did not present any evidence to demonstrate a material issue regarding his alleged inability to understand the standard statement read to him in English. In the absence of such evidence, the record fails to show that such an issue existed here. What the record does show is that each time defendant was asked to provide a breath sample, he said, "No." We therefore conclude that defendant's argument fails on both procedural and substantive grounds.
Affirmed.
FISHER, J.A.D., concurring.
I join in the judgment of the court insofar as it is based on procedural grounds. That is, I agree with the majority's holding that defendant failed to move to exclude evidence of his refusal to submit breath samples and, therefore, did not preserve for our consideration his claim that he did not understand the warnings required by N.J.S.A. 39:4-50.2(e). I do not, however, join in the majority's determination that the judgment may be affirmed on substantive grounds because I do not believe we are positioned to determine whether defendant understood the officer's English recitation of the statutory warnings. The videotape of that proceeding is utterly equivocal as to whether or to what extent defendant may have understood what the officer said to him in English,[1] and the *872 only other evidence on this point revealed the arresting officer's concerns about his ability to communicate with defendant. Moreover, I write separately to express my rejection of the State's contention that we would place too great a burden on law enforcement by interpreting N.J.S.A. 39:4-50.2(e) as requiring, once it may be fairly concluded that a suspect has a limited understanding of English, that rights must be conveyed in the suspect's native language. Back in 1966, when the statute in question was enacted, the State's argument had some appeal. See, e.g., State v. Nunez, 139 N.J.Super. 28, 351 A.2d 813 (Law Div.1976). But modern technology has overtaken Nunez and decisions like it, and it may no longer be fairly argued that it is burdensome for police to convey warnings to a suspect, when necessary, in a language other than English. With little effort, the Attorney General could provide police stations and state police barracks throughout this State with a database or e-files containing videos of persons reading the statutory warnings in a multitude of languages. And, with even less effort, police could simply generate written translations of the statutory rights from the scores of languages available on the internet.[2]
Had this issue been properly raised for our review, I would not hesitate to consign Nunez to the dust-bin of legal history. It is far too late in the day to argue in good faith that there is an administrative burden of sufficient weight to support the State's argument that the due process clause does not require the conveyance of these statutory warnings in a manner a suspect may understand.[3] Passing knowledge of the technological advances available to law enforcement (or anyone with internet access) should be sufficient to sweep away any nagging doubts. Here, had an attempt been made to ascertain defendant's primary or only language on the night in question, the police could have quickly obtained a Korean translation of the rights they were required to convey.[4] Instead, despite concerns of the arresting officer regarding the language barrier, the video reveals that another officer impatiently put off defendant's indications he did not understand by telling defendant to sit and wait until he finished reading in *873 English the statutorily-mandated rights.[5]
To summarize, I view the evidence as inconclusive as to whether or to what extent defendant understood English and I agree with the majority that defendant's failure to urge this issue by way of a suppression motion is fatal. However, I have been compelled to separately respond to the State's argument that, to comply with N.J.S.A. 39:4-50.2(e), police need only read the warnings in English even when police know the suspect knows no English.[6] Mr. Bumble's memorable description of what "the law is" provides a more than sufficient response to such a bankrupt interpretation of this important statute. Charles Dickens, Oliver Twist (1838).
Considering the Supreme Court recently heard argument in State v. Marquez, 408 N.J.Super. 273, 974 A.2d 1092 (App.Div.), certif. granted, 200 N.J. 476, 983 A.2d 201 (2009), which will undoubtedly resolve many of the questions posed by language barriers between police and suspects in these circumstances, there is no need to further burden the reader. I merely write to indicate my wholehearted agreement with the majority's disposition of the appeal on procedural grounds and my inability to agree with the disposition on substantive grounds or to accept the State's crabbed interpretation of N.J.S.A. 39:4-50.2(e).
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Because the court's decision could not be retrieved from the municipal court's hard drive, the matter was remanded for reconstruction of the record. This statement is excerpted from the court's written statement of reasons for its decision.
[1] Any attempt to gain sufficient meaning from defendant's few statements during the videotaped proceeding suffers from the illogic of assuming that because defendant may have understood some things said to him in English he must have understood all things said to him in English. Many persons may be able to speak or understand a few rudimentary phrases in languages other than their own. But, just because a person may be able to express greetings or order a cup of coffee in an unfamiliar language, does not necessarily mean that the person may be able to understand legal rights and obligations expressed in a less than familiar language.
[2] By following the simple instructions for uploading a document at translate.google.com, a Korean translation is instantaneously provided in response. The whole process takes less than one minute.
[3] In considering the reach of the due process clause, courts are required to consider three factors:

first, the private interest that will be affected by the official action; second, the erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, includ-ing the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
[Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976); see also Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 240, 952 A.2d 1060 (2008).]
In my view, significant and extensive deprivations will result if law enforcement officers do not provide readily available translations of the statutory warnings for our many neighbors and fellow residents who do not speak English or do not speak it well enough.
[4] I recognize that police may at times stop a driver who speaks a language so rarely encountered as to elude even the extensive menu of fifty-two languages available on "google." I do not believe this possibility absolves the government from taking any effort to provide an understandable version to those who do not speak English but speak another commonly spoken language.
[5] The State also argues that police are required only to "read" the rights to the suspect because the statute's last sentence directs that "[a] standard statement ... shall be read by the police officer to the person under arrest." N.J.S.A. 39:4-50.2(e) (emphasis added). That sentence, however, when read with undue strictness, negates the broader reach of the preceding sentence, which requires that the officer "shall ... inform the person arrested of the consequences of refusing to submit to such a test...." Ibid. (emphasis added). Reading aloud to the suspect is only one method of informing; if the suspect does not understand English, it is a quite ineffectual method. But, as modestly proposed here, other better methods are not forbidden. Where there is a language barrier between the officer and the suspect, fundamental fairnesslet alone the vindication of all the statute's terms, including its penultimate sentencecompels a construction that most importantly obligates police to inform rather than just read to the suspect, particularly when the circumstances suggest that the suspect will not understand an English recitation. In short, in putting this statute into practice when a language barrier arises, reason must prevail over the literal sense of its terms. Wene v. Meyner, 13 N.J. 185, 197, 98 A.2d 573 (1953).
[6] I fail to understand how it is a burden on law enforcement to take steps to provide multilingual translations of the statutory warnings when the Motor Vehicle Commission already permits applicants to take the written driving examination in Arabic, Chinese, French, Spanish, Polish, Portuguese, Russian, Japanese and, as relevant here, Korean. If it is not a burden for the government to give the driving test in languages other than English, why should we accept the argument it is too difficult for the government to convey these statutory warnings in languages other than English when a suspect is faced with legal penalties?